# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| JOHN CLEVELAND, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.:  3:05-CV-380 |
| | ) | (VARLAN/GUYTON) |
| BLOUNT COUNTY SCHOOL DISTRICT | ) | |
| 00050, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM & ORDER</u>

Plaintiffs John Cleveland ("Mr. Cleveland"), Connie Cleveland ("Ms. Cleveland"), and Pat Johnson ("Ms. Johnson") (hereinafter collectively referred to as "Plaintiffs") filed the present civil action, individually and as next friends, against Blount County School District 00050 ("School District") pursuant to 42 U.S.C. § 1983, alleging violations of the United States Constitution and Title VI of the Civil Rights Act of 1964.  The Plaintiffs also claim various violations of Tennessee state law by the School District.  The School District filed a motion for summary judgment [Doc. 37], which is ripe for determination.

The Court has carefully considered the parties' briefs, supporting materials [Docs. 37, 39, 44, 45, 46, 59, 60], and oral arguments in light of the entire record and controlling law.  For the reasons set forth herein, the School District's motion for summary judgment [Doc. 37] will be **GRANTED in part** and **DENIED in part**.

I.     Relevant Facts

Plaintiffs are African-American residents of Blount County, Tennessee. [Doc. 1 at ¶ 7.]  Mr. Cleveland and Ms. Cleveland are the parents of minor, Brittney Cleveland ("Brittney").  [Id.].  Ms. Johnson is the custodian of minors, Markiya Morrison ("Markiya") and Vincent Morrison ("Vincent"). [Id. at 9.][1] During the relevant period, Brittney, Markiya, and Vincent were students at William Blount High School ("WBHS").  [Id. at ¶ 25.]

The School District is a governmental agency duly authorized under the statutes of the State of Tennessee to provide public education through its various schools.  [Id. at ¶ 11.]

During the 2004-2005 school year, African-American and Caucasian students asked Christy Martin ("Dr. Martin"), principal of WBHS during the relevant time, about forming a "Step Team." [Doc. 37-4 at ¶ 2.]  The Step Team performed at a basketball game, and Dr. Martin claims that she received complaints about suggestive moves during the performance. [Id. at ¶ 3.]  According to Dr. Martin, the Step Team revised its routine for their next performance, but the Step Team was eventually disbanded after allegedly performing suggestive dance moves at a later performance and for other disciplinary problems.  [Id. at ¶ 3-5.]  Mr. Cleveland avers that the Step Team did not engage in suggestive moves.  [Doc. 59-2 at ¶ 7.]  Though Dr. Martin claims there was an attempt to meet with Step Team members regarding the disbandment of the Step Team, no meeting occurred. [Doc. 37-4 at

_____

[1]In its answer, the School District denies the allegation that Ms. Johnson is the legal custodian of Markya and Vincent. [Doc. 30 at ¶ 9.]

7.]  Mr. Cleveland claims that Dr. Martin refused to reschedule the meeting.  [Doc. 59-2 at ¶ 9.]

Also during the 2004-2005 school year, WBHS experienced a period of heightened racial tension. [Doc. 37-2 at ¶ 1.] Incidents included rumors about guns found at WBHS, fights, and racial graffiti, including a "hit list" with names of African-American students. [*Id.* at ¶¶ 4, 6].

On April 6, 2005, the Blount County Sheriff's Office informed school officials that a WBHS student being held at the Blount County Juvenile Detention Center revealed that someone at WBHS planned to pull the fire alarm and kill African-American students during the evacuation. [*Id.* at ¶ 7.] After school officials met with the Blount County Sheriff and an FBI agent, Blount County Sheriff's Deputies secured WBHS's premises and swept through the school for weapons. [*Id.*] While deputies secured WBHS's campus, the Blount County Sheriff announced a $500 reward, later increased to $1000, for information leading to the arrest of those responsible for the "hit list." [*Id.* at ¶ 9.] The Blount County Sheriff's Office remained present at WBHS until Spring Break. [*Id.* at ¶ 10.]

On April 27, 2005, WBHS school officials met with several WBHS parents, including Mr. Cleveland, Ms. Cleveland, and Ms. Johnson.  The parents presented school officials with a list of recommendations. [Doc. 37-2 at 8].  School officials sent Ms. Johnson a letter responding to the list of recommendations. [Doc. 37-2 at 9-10.]  After these events, Alvin Hord ("Mr. Hord"), the Director of Schools for Blount County School System, determined that a dress code should be uniformly enforced to ban the wearing of racially divisive

symbols, including the Confederate flag that was linked to some racial graffiti.  On July 6, 2005, Ms. Johnson and Mr. Cleveland met with Mr. Hord and Dr. Martin.  On August 4, 2005, the Plaintiffs filed the present civil action.  [Doc. 1.]

II.   Analysis

A.  Standard of Review

Under Fed. R. Civ. P. 56(c), summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The moving party bears the burden of establishing that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986).  The court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002).  To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law.  *Id.*

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question.  *Id.* at 249.  The judge does not weigh the evidence, judge the credibility of witnesses, nor determine the truth of the matter.  *Id.*  Thus, "[t]he inquiry performed is the

threshold inquiry of determining whether there is the need for trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

B. §1983 Claims

42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." To prevail on a § 1983 claim, a plaintiff must prove (1) deprivation of a right protected by the Constitution or laws of the United States (2) by person acting under color of state law. *Boykin v. Van Buren Twp*., 479 F.3d 444, 451 (6th Cir. 2007) (citing *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003)). Municipalities and other local government units are included among those "persons" to whom § 1983 applies. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). However, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. Pursuant to § 1983, Plaintiffs make claims under the First Amendment, the Fourteenth Amendment, and Title VI.

1.    <u>First Amendment Claims</u>

The First Amendment of the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people to peaceably to assemble, and to petition the government for a redress of grievances." U.S. Const. amend. I.

Plaintiffs first claim that invasion of privacy constitutes a violation of the First Amendment. [Doc. 19 at 7.] They allege that "the minor Plaintiffs were not allowed to contact their parents/custodians relative to what was ongoing in the school" and that "[c]ellular phones were gone through and taken away." [*Id.*] The School District contends that invasion of privacy is not a recognized violation of the First Amendment. [Doc. 37 at 6.]

After reviewing the relevant law, the Plaintiffs cannot maintain a First Amendment claim on the basis of the alleged invasion of privacy of which they claim. Although there are cases where First Amendment rights are implicated by acts of invasion of privacy, *see Mattox v. City of Forest Park*, 183 F.3d 515, 520 (6th Cir. 1999), the Plaintiffs have provided no authority supporting their contention as to the specific acts alleged. Indeed, the Plaintiffs did not even address in their response brief or at oral argument how these acts violated the First Amendment. In light of the lack of authority and argument by Plaintiffs, the invasion of privacy claims will not support allegations of First Amendment violations.

Plaintiffs also contend that their First Amendment claim is based on the dissolution of the Step Team. [Doc. 45 at 7.] The School District replies that Plaintiffs have provided no

authority to support the allegation that participation in extracurricular activities is a protected form of expression. [Doc. 46 at 6.]

Plaintiffs correctly point out that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). Under the *Tinker* standard, "school officials may regulate speech that materially and substantially interferes 'with the requirements of appropriate discipline in the operation of the school.'" *Lowery v. Euverard*, 497 F.3d 584, 588 (quoting *Tinker*, 393 U.S. at 513). However, the holding in *Tinker* has been refined by subsequent Supreme Court cases establishing four frameworks for evaluating student speech: (1) vulgar and obscene speech is governed by *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675 (1986); (2) school-sponsored speech is governed by *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988); (3) student speech promoting illegal drug use is governed by *Morse v. Frederick*, 127 S. Ct. 2618 (2007); and (4) all other speech is governed by *Tinker*, 393 U.S. 503 (1969). *See Morse,* 127 S. Ct. at 2629; *Lowery*, 497 F.3d at 588.

After reviewing these cases, *Kuhlmeier* provides the appropriate standard for the facts of this case. In *Kuhlmeier*, the Supreme Court distinguished between student speech tolerated by a school and student speech that the school affirmatively promotes. *Kuhlmeier*, 484 U.S. at 270-71. The present case involves school-sponsored speech, as evidenced by Dr. Martin's requirement that the Step Team needed a faculty sponsor, prior limitations on the type of dancing and music utilized for performances, and the Step Team's performances at WBHS basketball games [Doc. 37-4 at ¶¶ 2, 3, 5.] The complaints received by the Dr.

Martin after some of the Step Team's performances provide further evidence that "students, parents, and members of the public might reasonably perceive [the Step Team's performances] to bear the imprimatur of the school." *Kuhlmeier*, 484 U.S. at 271. Thus, the Court will employ the *Kuhlmeier* framework in analyzing the Plaintiff's First Amendment claims as to the disbanding of the WBHS Step Team.

In *Kuhlmeier*, the Supreme Court held that the school-sponsored speech "concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." *Id.* Furthermore, "[t]hese activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Id.* Under the *Kuhlmeier* standard, "[i]t is only when the decision to censor a school-sponsored publication, theatrical production, or other vehicle of student expression has no valid educational purpose that the First Amendment is so 'directly and sharply implicate[d],' . . . as to require judicial intervention to protect students' constitutional rights." *Id.* at 274 (alternation in original) (citation omitted). Thus, educators' decisions with regard to the content of school-sponsored expressive activities are entitled to substantial deference.

"A school must be able to set high standards for the student speech that is disseminated under its auspices . . . and may refuse to disseminate student speech that does not meet those standards." *Id*. at 271-72. In the present case, the School District has shown

a "valid educational purpose" for the restrictions on the Step Team's performances, namely concerns about the material being inappropriate for the level of maturity of the audience at basketball games. [Doc. 37-4 at ¶ 2 (concerning requirements on appropriate dress, dance, and music).] In light of Dr. Martin's prior warnings and faculty and community complaints about the content of the Step Team's performance[2], the School District had a "valid educational purpose" for restricting the Step Team and regulated the content in a reasonable manner sufficient to satisfy the requirements of *Kuhlmeier*.

Additionally, the fact that the speech at issue was part of an extracurricular activity further weakens the Plaintiff's claims of a First Amendment violation. "It is well-established that students do not have a general constitutional right to participate in extracurricular" activities. *Lowery*, 497 F.3d at 588. The Sixth Circuit has held that "extracurricular activities offered at the school [are] . . . 'committed to the control of state and local authorities.'" *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 396 (6th Cir. 2005) (quoting *Goss v. Lopez*, 419 U.S. 565, 578 (1975)). "It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion." *Lowery*, 497 F.3d at 589 (quoting *Wood v. Strickland*, 420 U.S. 308, 326 (1975)). In light of the school's discretion as to extracurricular activities and the absence of any specific First Amendment violation, summary judgment will be granted as to Plaintiffs' First Amendment claims.

_____

[2]It is uncontested that Dr. Martin received complaints regarding the Step Team's final performance. [Docs. 37-4 at ¶ 5, 59-2 at ¶ 10.]

The Court notes that the Plaintiffs' arguments regarding differing treatment of the Step Team from WBHS's cheerleaders and Dance Team on the basis of race is more properly an equal protection claim. Accordingly, that argument will be addressed along with the Plaintiffs' other equal protection claims.

2.    Fourteenth Amendment Substantive Due Process Claim

The Fourteenth Amendment provides that no "State [shall] deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Under the doctrine of substantive due process, "the Fourteenth Amendment's Due Process Clause protects unenumerated liberties." *Tennessee v. Lane*, 541 U.S. 509, 562 (2004). For municipal liability claims under § 1983, there is a two-pronged inquiry: (1) Whether the plaintiff has asserted the deprivation of a constitutional right at all; and (2) Whether the municipal entity is responsible for that violation. *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 505-06 (6th Cir. 1996). To establish the second prong, a plaintiff must either establish that there was an officially executed policy or "the toleration of a custom within the school district [that] leads to, causes, or results in the deprivation of a constitutionally protected right." *Id.* at 507.

Plaintiffs contend that the School District acted with deliberate indifference in light of the persistent pattern of racial discrimination towards African-American students at WBHS. They significantly rely on documents and depositions from another litigation in which the School District was a party. Plaintiffs provide a litany of racially-related incidents including threats against African-American students, racial graffiti, and the presence of

Confederate flag clothing at the school. [Doc. 45 at 10-12.] Plaintiffs argue that there is a genuine issues of material fact as to the insufficient and deliberately indifferent response by the School District to these incidents of racial discrimination.

The School District contends that it acted reasonably and complied with its policies whenever incidents of racial discrimination occurred. [Doc. 39 at 7.] It points to its formal grievance procedure, its investigation of racial harassment claims, its cooperation with law enforcement, and its meetings and correspondences with concerned parents and community members. [*Id*. at 7-11.]

For Plaintiffs to prevail on an "inaction theory" for municipal liability, they must show: (1) The existence of a clear and persistent pattern of abuse; (2) Notice or constructive notice on the part of the School Board; (3) The School Board's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) The School Board's custom was the "moving force" or direct causal link in the constitutional deprivation. *Doe*, 103 F.3d at 508. The Sixth Circuit has noted that "'deliberate indifference' in this context does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing an obvious, deliberate indifference to . . . abuse." *Williams ex rel. Hart. v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 369 (6th Cir. 2005).

In the present case, the School District contends that Plaintiffs have not satisfied the third element of the "inaction theory." Mr. Cleveland's affidavit discusses statements by school officials about the inability to protect African-American students [Doc. 59-2], and the

School District has presented evidence of steps taken by the School District to counter racial discrimination at WBHS, including investigations performed by school officials, the presence of formal grievance procedures, diversity training and handbooks, discipline of identified students involved in racial discrimination, immediate removal of racial graffiti and subsequent law enforcement investigations, further involvement and cooperation with Blount County law enforcement for serious incidents, enforcing the dress code as to racially divisive symbols, meeting with and responding to concerns by parents and other community members. [Docs. 37-2 at ¶¶ 4, 7, 8, 9, 11, 12, 13, 15, 16, 17; 37-3 at ¶¶ 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14; 37-4 at ¶¶ 9, 11, 12, 14, 15; 38-2 at ¶¶ 2, 3, 5; 38-6 at ¶¶ 2, 3.]

Considering such evidence in a light most favorable to the Plaintiffs, there is a genuine issue of material fact as to whether the School District acted with deliberate indifference. The Sixth Circuit has previously held that a school district is liable for acting with deliberate indifference when its response is "*clearly unreasonable* in light of known circumstances." *Willliams ex rel. Hart*, 400 F.3d at 364. Thus, "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act *reasonably* in light of the known circumstances." *Id.* Though the School District has presented evidence of steps taken in response to the racial incidents at WBHS, the Plaintiff has presented evidence of the School District communicating that "there was nothing they could do . . . to protect less than 10% of the student population from the remainder of the student population." [Doc. 59-2 at 2.] Thus, there is a genuine issue of material fact as to the issue of deliberate indifference.

### 3. Fourteenth Amendment Equal Protection Claim

The Fourteenth Amendment provides that no State "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. In other words, the equal protection clause guarantees that similar individuals will be dealt with in a similar manner by the government.

To hold a municipality liable for equal protection violations under § 1983, the municipality is liable only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Bennett v. City of Eastpointe*, 410 F.3d 810, 818-19 (6th Cir. 2005) (quoting *Monell*, 436 U.S. at 694). Additionally, there must be an "affirmative link between the policy and the particular constitutional violation alleged." *Bennett*, 410 F.3d at 819 (quoting *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)). Thus, the § 1983 analysis for equal protection is similar to that for due process discussed above. The School District has not expressly classified the Plaintiffs on the basis of their race, so the central inquiry is whether there was a discriminatory effect on an identifiable group when a facially neutral law or policy was applied.

Plaintiffs' three equal protection arguments are: 1) Exposing Minor Plaintiffs' to racially divisive slang terms, 2) Not uniformly enforcing the dress code, and 3) Disbanding of the Step Team which consisted of more African-American students than Caucasian students.

Defendant contends that the School District's policies did not result in violations of equal protection. The exposure to racially divisive slang terms at the school were not exclusive to African-American students as there was also profane and derogatory language towards Caucasian students. The School District also uniformly enforced its dress code. The Step Team was disbanded after members performed in violation of school rules. The School District contends that the Plaintiffs have presented no evidence that the School District acted with a racially discriminatory intent or purpose.

Plaintiffs contend that race is a suspect classification for Equal Protection purposes, and the exposure to racially divisive slang terms were exclusive to African-American students. Furthermore, they claim that the threats of violence in conjunction with the racial profanities at the school demonstrate unequal treatment. Plaintiffs also contend that the dress code was also not uniformly enforced until after hit lists threatened African-American students.

Defendants reply that Plaintiffs have presented no evidence that Defendants treated them any differently because of their race. They merely make the conclusion that the numerosity of racial slurs constitutes unequal treatment. The Step Team included both African-American and Caucasian students, and it was disbanded for disciplinary problems. Defendants argue that Plaintiffs have presented no facts to show they were treated differently than similarly situated persons.

Plaintiffs' first equal protection claim centers on the exposure of the Minor Plaintiffs to racially divisive terms by other students. The School District brings up the salient point

that exposure to racial slurs from other students does not involve express differing treatment by the School District itself. The Sixth Circuit previously recognized that racial harassment by government employees can violate the Equal Protection Clause, but supervisory officials are not liable for harassment by subordinates "absent 'a showing that the supervisor encouraged the . . . misconduct or in some other way directly participated in it." *Knop v. Johnson*, 977 F.2d 996, 1014 (6th Cir. 1992) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). The Sixth Circuit affirmed the district court's grant of summary judgment of an equal protection claim when there was no evidence suggesting that the defendants "caused or participated in an alleged constitutional deprivation." *Wilson v. Seiter*, 893 F.2d 1336 (6th Cir. 1990) (citation omitted). Likewise, the School District should not be liable for an equal protection violation absent evidence of encouragement or participation in the use of racially divisive slang terms at WBHS. Because Plaintiffs have presented no evidence of encouragement or participation by the School District, their equal protection claim cannot prevail on such grounds.

Plaintiffs' second equal protection claim is that the School District failed to uniformly enforce the dress code until after the hit list incidences, leading to unequal or favorable treatment of Caucasian students. The Supreme Court has held that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977). To prevail on an equal protection claim, a plaintiff must "show both a discriminatory purpose and a discriminatory effect." *Gardenhire v. Shubert*, 205 F.3d 303, 318 (6th Cir. 2000).

Though Plaintiffs present evidence of inconsistent application of the ban on Confederate flag clothing after its implementation in 2002, lax enforcement of a policy is not sufficient to establish discriminatory purpose. *See Washington v. United States*, 401 F.2d 915, 925 (1968). Discriminatory purpose can be shown by demonstrating that the 'decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects on an identifiable group.'" *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 534 (6th Cir. 2002) (citations omitted). In the present case, the evidence does not support a finding that the lack of enforcement was at least partly due to the Plaintiffs' race. The alleged statements of three School District employees do not indicate that the lack of enforcement was due to the Plaintiffs' race [Doc. 45 at 17]. Rather, such statements indicate that the alleged lack of enforcement occurred in spite of its adverse effects on African-American students. In light of the lack of discriminatory purpose evidence as to the dress code, the Plaintiffs have not made the required showing for discriminatory purpose for their equal protection claim.

Plaintiffs' third equal protection claim is that the dissolution of the Step Team constituted an equal protection violation. Essentially, Plaintiffs make a selective enforcement argument that the School District treated the Step Team, comprised of both African-American and Caucasian students, differently from other performance groups comprised of only Caucasian students. "The Equal Protection Clause requires public institutions to 'treat similarly situated individuals in a similar manner.'" *Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1360 (6th Cir. 1996) (quoting *Gutzwiller v. Fenik*, 860 F.2d 1317, 1328 (6th Cir.

1988)).  In opposition to a motion for summary judgment, a plaintiff "possesses the burden of demonstrating that the defendants treated similarly situated individuals in a disparate manner." *Buchanan*, 99 F.3d at 1360.  In *Buchanan*, the Sixth Circuit affirmed the grant of summary judgment for an equal protection claim in a case where the assistant principal filed an affidavit that "he treated plaintiff's minor son no differently than any other student," and plaintiff "did not bring forth any evidence of similarly situated Caucasian students who were treated differently than her son." *Id.*

Similarly, Plaintiffs have not presented sufficient evidence that the School District treated Caucasian students differently from the Minor Plaintiffs.  The School District has presented evidence that Dr. Martin "addressed the same [dance movement] issues with the Dance Team" as were discussed with the Step Team. [Doc. 37-4 at ¶ 3.] Furthermore, Dr. Martin's affidavit also states that after she discussed the dance movement issues with the Step Team, she "received numerous complaints from the faculty and community" after a subsequent performance. [*Id.* at ¶ 5.] Dr. Martin's affidavit further states that there were other discipline problems, aside from the performance content of the Step Team. [*Id.* at ¶ 4.] Plaintiffs' supporting evidence confirms the presence of complaints about the Step Team's performances, and presents no evidence of similar complaints as to other WBHS performance teams.  [*See* Doc. 59-2 at ¶ 10.] Plaintiffs also present no evidence of non-performance-related discipline problems as to the Dance Team or cheerleaders.  Plaintiffs have not presented sufficient evidence of similarly situated Caucasian students being treated differently from the Minor Plaintiffs in light of the School District's evidence of

distinguishing circumstances contributing to the Step Team's dissolution, so the Court will grant summary judgment as to the equal protection claim.

        4.     <u>Title VI</u>

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

Plaintiffs make several claims under Title VI. First, they claim a racially hostile school environment due to harassment by other WBHS students. Additionally, they make Title VI claims based on the dissolution of the Step Team and teachers not allowing the minor Plaintiffs to participate in classroom discussion. [Doc. 45 at 18.]

The School District contends that it fully developed policies to deter racial hostility and discrimination. [Doc. 39 at 15.] The School District relies on its response to all racially-related complaints, internal school investigations, and contact with the proper law enforcement authorities when racial incidents occurred. [*Id*.] Other actions include meeting with the Plaintiffs when they had concerns, training faculty and staff on discrimination policies, and distributing handbooks to all students containing the School District's nondiscrimination policy. [*Id*. at 15-16.]

As to Plaintiffs' allegations that teachers did not allow the minor Plaintiffs to participate in classroom discussion, the record is devoid of evidence supporting this contention. The affidavits presented by the Plaintiffs make no mention of these alleged acts

by WBHS teachers. [*See* Docs. 59-2, 59-3, 59-4.] Without supporting evidence, the Plaintiffs have made mere conclusory allegations. *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 713 (6th Cir. 2006) (finding that "conclusory allegations unsupported by any evidence . . . cannot create a genuine issue of material fact"). Thus, the Plaintiffs cannot sustain their Title VI claim on those grounds.

The Plaintiffs also make a Title VI claim based on Dr. Martin's decision to dissolve the Step Team. If Plaintiffs prove by a preponderance of evidence a prima facie case of discrimination, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the discharge. The burden then shifts back to the plaintiff who has the opportunity to prove that the reasons provided by the defendant are mere pretext for discrimination. *Bryant v. Indep. Sch. Dist. I-38 of Garvin County, Oklahoma*, 334 F.3d 928, 930 (10th Cir. 2003). In the present case, Plaintiffs have alleged that the Step Team was dissolved for allegedly performing suggestive dance moves, while the solely Caucasian dance team and cheerleaders were not subject to similar discipline for allegedly similar behavior. The School District rebuts the presumption of discrimination by showing that the Step Team received at least one warning prior to the dissolution of the Step Team and that only the Step Team was subject to audience complaints. The Plaintiffs must present evidence that the School District's reason is pretext; however, they have not done so. They have presented no evidence that the dance team or cheerleaders were the subjects of complaints by faculty and community members or had incidents of non-performance-related disciplinary problems. They have presented no evidence of a discriminatory intent by the School District

as to the dissolution of the Step Team. Thus, Plaintiffs have not raised a factual dispute regarding this allegation, and they cannot sustain their Title VI claim on the basis of the Step Team's dissolution.

In the context of student-on-student harassment, the Supreme Court held that an action for private damages may lie against a school board in cases of student-on-student harassment, "but only where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 633 (1999). In *Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 258 (6th. Cir. 2000), the Sixth Circuit held that Title IX may support a claim for student-on-student sexual harassment when the plaintiff can demonstrate the following elements: (1) The sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school; (2) The funding recipient had actual knowledge of the sexual harassment; (3) The funding recipient was deliberately indifferent to the harassment. Title IX was patterned after Title VI, so judicial analysis of Title IX is informative and helpful in understanding the meaning, requirements, and scope of Title VI. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).

In the present case, there is sufficient evidence of the first two elements of the prima facie case for student-on-student harassment. First, the threats and slurs by other students towards the minor Plaintiffs is evidence of racial harassment so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational

opportunities or benefits provided by the school. Mr. Hord acknowledged in his affidavit the racial graffiti, "hit lists," fights, and incidents and threats of violence at WBHS. [Doc. 37-2 at ¶¶ 4]. Furthermore, "[i]t does not take an educational psychologist to conclude that being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, being shamed and humiliated on the basis of one's race, and having the school authorities ignore or reject one's complaints would adversely affect a Black child's ability to obtain the same benefit from schooling as her white counterparts." *Bryant*, 334 F.3d at 932 (quoting *Monteiro v. Tempe Union High Sch. Dist.*, 334 F.3d 928, 932 (9th Cir. 1998)). Second, the School District had actual knowledge of harassment because Plaintiffs and the Knoxville Branch President of the NAACP notified school officials of their concerns over racially related incidents at WBHS. [*Id.* at ¶¶ 5, 6, 15]. Thus, the remaining issue is whether the Plaintiffs have presented sufficient evidence to support the third element of the prima facie case, namely that the School District acted with deliberate indifference.

For a school district to be liable for acting with deliberate indifference, the Sixth Circuit held that "[w]here a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior. Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act *reasonably* in light of the known circumstances." *Williams ex rel. Hart.*, 400 F.3d at 364.

Notably, the Tenth Circuit held in a case involving claims of hostile educational environment that "[i]t is impossible to discern at the summary judgment stage whether the principal and administrators of [the school] intentionally allowed and nurtured the racially hostile environment to the boiling point of [a fighting incident]." *Bryant*, 334 F.3d at 933. In the present case, there is evidence that the racial tension at WBHS escalated throughout the Spring of 2005. [Doc. 37-2 at ¶ 6.] Evidence presented suggests that the racial tensions continued to escalate when the Knoxville Branch President of the NAACP wrote to the School District about the situation on March 30, 2005. [Doc. 37-2 at 6.] The racial incidents culminated to the point where there were threats on the lives of African-American students at WBHS on April 6, 2005 that required involvement by law enforcement. [Doc. 37-2 at ¶¶ 7.] In light of such evidence, there remains a genuine issue of material fact as to whether the School District acted with deliberate indifference in the face of the escalating racial tension at WBHS.

B.     Tennessee State Law Claims

In their supporting memorandums [Docs. 39, 45, 46], the parties contend that the Tennessee State Law claims should either be retained or dismissed on the basis of whether the federal law claims survive summary judgment. Because there are remaining federal claims in this action, the dismissal of Plaintiffs' state law claims is not appropriate at this time for the reasons contended by the School District.

III.    Conclusion

For the reasons set forth herein, Blount County School District 00050's motion for summary judgment [Doc. 37] is **GRANTED in part** and **DENIED in part**, whereby Plaintiffs' First Amendment and Equal Protection claims are **DISMISSED with prejudice**. The case will proceed to trial on Plaintiffs' Fourteenth Amendment Substantive Due Process, Title VI, and Tennessee state law claims against defendant Blount County School District 00050.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE